CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

JUL 2 1 2008

JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### HARRISONBURG DIVISION

|  |  |  |  |
|---|---|---|---|
| **BRENDA L. SEEKFORD,** | ) | Case No. 5:07cv00045 | |
|  | ) | | |
| *Plaintiff,* | ) | **REPORT AND** | |
| v. | ) | **RECOMMENDATION** | |
|  | ) | | |
| **MICHAEL J. ASTRUE,** | ) | By: | Hon. James G. Welsh |
| Commissioner of Social Security, | ) | | U. S. Magistrate Judge |
|  | ) | | |
| *Defendant,* | ) | | |
|  | ) | | |

The plaintiff, Brenda L. Seekford, brings this action pursuant to 42 U.S.C. § 1383(c)(3) challenging the final decision of the Commissioner of the Social Security Administration ("the agency") denying her claim for a period of disability insurance benefits under Title II of the Social Security Act, as amended ("the Act"), 42 U.S.C. §§ 416(i) and 423. Jurisdiction of the court is pursuant to 42 U.S.C. § 405(g).

The Commissioner's Answer was filed on September 12, 2007, along with a certified copy of the administrative record ("R.") containing the evidentiary basis for the findings and conclusions set forth in the Commissioner's final decision. By order of referral entered September 18, 2007, this case is before the undersigned magistrate judge for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

On appeal, the plaintiff's basic contentions are: (1) the Administrative Law Judge ("ALJ") erred in finding that the plaintiff's migraine headache syndrome was not "severe" within the meaning of the Act; and (2) the functional capacity limitations identified by her treating physician, Dr. Glen Gray, were not given the requisite evidentiary weight by the ALJ. Addressing both of these contentions, the plaintiff argues that these findings result from a misreading of the record [1] and from a failure to recognize Dr. Gray's longitudinal record of treatment both for her recurring migraine headaches and for her chronic low back pain and attendant right lower extremity rediculopathy. No written request was made for oral argument. [2]

Based upon a thorough review of the administrative record and for the reasons herein set forth, it is recommended that the Commissioner's motion for summary judgment be denied, the Commissioner's final decision be reversed, and the case remanded solely for the purpose of calculating and paying benefits.

## I.      Standard of Review

---

[1] In his written decision the ALJ assigned minimal weight to the treating source assessment of Dr. Gray on the basis an absence of "significant treatment for approximately 1-year" prior to its preparation shortly before the administrative hearing in July 2006. (R.22.) Indicative of the ALJ's error, she references the court to the fact that she saw Dr. Gray approximately monthly between June 28, 2005 and February 16, 2006, that during this period Dr. Gray had routinely adjusted both her chronic headache and chronic back pain medication regimes, and that Dr. Gray's assessment was at least based in part on his July 2005 assessment of her range of motion limitations. (R.218, 231-238.)

[2] Paragraph 2 of the court's Standing Order No. 2005-2 requires that the plaintiff in a Social Security case must request oral argument in writing at the time his or her brief is filed.

2

The court's review in this case is limited to a determination as to whether there is substantial evidence to support the Commissioner's conclusion that the plaintiff failed to meet the statutory conditions for entitlement to a period of disability insurance benefits. "Under the . . . Act, [a reviewing court] must uphold the factual findings of the [Commissioner], if they are supported by substantial evidence and were reached through application of the correct legal standard." *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (*quoting Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). This standard of review is more deferential than *de novo*. "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Mastro*, 270 F.3d at 176 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." *Id.* (*quoting Craig v. Chater*, 76 F.3d at 589). The Commissioner's conclusions of law are, however, not subject to the same deferential standard and are subject to plenary review. *See Island Creek Coal Company v. Compton*, 211 F.3d 203, 208 (4th Cir. 2000); 42 U.S.C. § 405(g).

## II.    Administrative History

Alleging an April 4, 2005 disability onset date, the record shows that the plaintiff protectively filed her application seeking a period of disability and disability insurance benefits on April 27, 2005. (R. 16,60,81.) In her application she stated that she became disabled due to work-related injuries to her back, leg and hip. (R. 84.)

3

After her application was denied, both initially and on reconsideration, a hearing was held on July 5, 2006 before an ALJ. (R.28-32, 35-37, 251.) The plaintiff was present, testified, and was represented by counsel. (R.16, 251.) Also present was Robert Jackson, who testified as a vocational witness. (R.16, 274.)

Utilizing the agency's sequential decision-making process,[3] the ALJ concluded at step-five that the plaintiff retained the functional ability to perform a limited range of sedentary work[4] and was insured through the decision date. (R.16-24.) After denial of her claim by written decision dated October 27, 2006, the plaintiff requested administrative review. (R.12, 24.) Her request was denied, and the ALJ's decision now stands as the Commissioner's final decision. (R.5.) *See* 20 C.F.R. § 404.981.

After determining that the plaintiff met the non-disability requirements of the Act and had not engaged in substantial work activity since the alleged disability onset date, the ALJ found that the plaintiff suffered from a back disorder and obesity. (R.18.) He next determined that while these

---

[3] Determination of eligibility for social security benefits involves a five-step inquiry. *Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001). It begins with the question of whether the individual engaged in substantial gainful employment. 20 C.F.R. § 404.1520(b). If not, step-two of the inquiry requires a determination of whether, based upon the medical evidence, the individual has a severe impairment. 20 C.F.R. § 404.1520(c). If the claimed impairment is sufficiently severe, the third-step considers the question of whether the individual has an impairment that equals or exceeds in severity one or more of the impairments listed in Appendix 1 of the regulations. 20 C.F.R. § 404.1520(d). If so, the person is disabled; if not, step-four is a consideration of whether the person's impairment prevents him or her from returning to any past relevant work. 20 C.F.R. § 404.1520(e); 20 C.F.R. § 404.1545(a). If the impairment prevents a return to past relevant work, the final inquiry requires consideration of whether the impairment precludes the individual from performing other work. 20 C.F.R. § 404.1520(f).

[4] Sedentary work involves lifting items weighing up to 10 pounds and occasionally carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing may be necessary to carry-out the job duties. *See* 20 C.F.R. § 404.1567(a).

4

impairments were "'severe' within the meaning of the Regulations,"[5] they did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appx. 1 *See* 20 C.F.R. § 404.1520(c)-(d). (R. 20.)

At step-four of the decisional process, the ALJ concluded that the plaintiff lacked the residual functional ability to perform her past relevant work, and based on the evidence he concluded at step-five that the plaintiff retained the ability to perform a limited range of sedentary work. (R.20-22.)

## III. Facts

The plaintiff was born in 1962 and was forty-four years of age at the time of the administrative hearing.[6] (R.81,253.) The ALJ noted that she had completed the ninth grade in school and was able to communicate in English.[7] (R. 22, 256.) Her past work experience was as a motel/hotel housekeeper, which the vocational witness described as exertionally "light" and unskilled. (R. 254, 275.)

---

[5] Quoting *Brady v. Heckler*, 724 F.2ᵈ 914, 920 (11ᵗʰ Cir. 1984), the Fourth Circuit held in *Evans v. Heckler*, 734 F.2ᵈ 1012, 1014 (4ᵗʰ Cir. 1984), that "an impairment can be considered as 'not severe' only if it is a *slight abnormality* which has such a *minimal effect* on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." *See also* 20 C.F.R. § 404.1520(c).

[6] At this age the plaintiff is classified as a "*younger person*," and pursuant to the agency's regulations, age is generally considered not to affect seriously a younger person's ability to adjust to other work. 20 C.F.R. § 404.1563(c).

[7] As a vocational factor, this is classified as a "*limited education*," which "means [an] ability in reasoning, arithmetic, and language skills, but not enough to allow a person with these educational qualifications to do most of the more complex job duties needed in semi-skilled or skilled jobs." 20 C.F.R. §§ 404.1564(b)(3) and 416.964(b)(3).

The medical record shows that the plaintiff sought treatment from Dr. Glen Gray on March 3, 2005 for headaches characterized by frequent throbbing, photophobia and nausea. (R. 190.) His diagnosis was that she had a "migraine disorder." (*Id.*) He found her cranial nerves to be grossly intact; she exhibited no motor skill abnormality; he prescribed Inderal and Imitrex, and he suggested that she try and keep a headache diary. (R. 190.)

Two weeks later, she was seen in the emergency room at Augusta Medical Center ("AMC") with complaints of severe back pain due to a work-related injury. (R.200.) On examination she was found to have an acute back spasm. She was given Vicodin (a combination of acetaminophen and hydrocodone) as a pain reliever and Flexeril as a muscle relaxant. (*Id.*) Two days later, the plaintiff went to the emergency room at Rockingham Memorial Hospital ("RMH") with continuing complaints of acute low back pain. On clinical examination, her pain was found to be localized in the lumbosacral area; X-rays of the area demonstrated that the plaintiff had mild degenerative disc disease, and immediate pain relief was obtained by intramuscular injections of Demerol, Toradol and Valium. (R.168-169.)

When she saw Dr. Gray on April 5, 2005, the plaintiff reported that her headaches had improved with medications, but she was experiencing ongoing back pain and had developed pain running down the right leg. (R.188-189.) On examination, Dr. Gray found no deterioration of motor strength , and he suggested that the use of some specific stretching exercises and lifting techniques might be beneficial. (R.189.) The following day, however, she returned to Dr. Gray's office and reported the onset of acute back and right leg pain. (R.188.) She was unable to sit due to the acute

6

pain. Dr. Gray noted her back to be tender on palpitation, and he prescribed an aggressive medication regime that included Percocet (a combination of oxycodone and acetaminophen) and a Medrol Dosepak (a six-day tapering dose regime of methylprednisolone). (*Id.*)

One week later, she was seen for a scheduled follow-up office visit. At that time she reported no back pain improvement and a continuation of a significant right lower extremity radiculopathy. (R.187.) Although Dr. Gray adjusted her medication regime and scheduled her for a follow-up appointment in two weeks (*Id.*), her pain and discomfort continued to the degree that she went to the emergency room at RMH on April 11, 2005 (R.150-155.). Based on a working diagnoses which included acute lumbago, degenerative disk disease and a urinary tract infection, Cipro and Percocet were prescribed, and she was advised to see her family doctor. (R.154.) When she saw Dr. Gray the following day, he found her to have straight-leg-raising pain to her knee and to have continuing low back pain with a significant right lower extremity radiculopathy. (R.187.) Based on her symptomology, Dr. Gray modified her medications to include a combination regime which included Flexeril, Percocet and Motrin. (*Id.*)

At the time of her next scheduled office visit on April 26, 2005, Dr. Gray found the plaintiff's low back pain to be "slowly improving;" however, she continued to have significant radicular pain into her right leg. (R.186.) In addition, she reported experiencing daily migraine-type headaches along with attendant nausea. (*Id.*) Dr. Gray noted that she had been medication compliant and continued to be unable to work. (*Id.*) Her prescriptions for Percocet and Flexeril were refilled, and she was advised to continue her physical therapy exercises. (*Id.*)

7

Due to the persistent acute migraine-like symptoms, the plaintiff went to the emergency room three days later and was treated by intravenous administration of Compazine, Toradol, and Ativan. (R.198.) Although the plaintiff subsequently developed superficial bruising at the IV site, this transient medical problem cleared without any complications. (R.185.)

Episodes of exacerbated right-sided low back pain also resulted in additional emergency room visits by the plaintiff on May 6, May 7 and again on May 11, 2005. (R.140-144,196-197.) On each occasion pain medications were prescribed, and she was advised to follow-up with her primary care physician. (*Id.*) In accordance with this advice, the plaintiff was seen by Dr. Gray on May 9 and again on May 19, 2005. On May 9, Dr. Gray continued the same medication regimen and sent the plaintiff for a magnetic resonance imaging ("MRI") study. (R.184.) When Dr. Gray saw her on May 19, the plaintiff reported having continuing right-sided low back radicular pain. She also reported having significant recurring migraine headaches and to be unable to afford to refill her headache medication. (*Id.*) Her medications were modified; she was given samples, and consideration of other treatment modalities was deferred pending receipt of the MRI results. (R.182-183.)

At the time of the plaintiff's next office visit on May 27, Dr. Gray noted that the MRI results demonstrated an L5/S1 disc protrusion and a slight l2 vertebral compression fracture of unknown etiology. (R.182,230; *see* R.219.) On examination Dr. Gray again found the plaintiff's back to be "quite tender" with right-sided radiculopathy; he noted that she had not tolerated physical therapy well; he continued her pain medications, and he noted that a neurosurgical evaluation was medically indicated. (*Id.*)

8

As part of the state agency's development of the administrative record in this case, Dr. Gray was asked whether the plaintiff was functionally able to touch her knees. (R.213.) In response, Dr. Gray advised the state agency that the plaintiff was functionally unable to bend-over to reach either her knees or feet, that she is able to walk only about one-quarter of a mile, that she did not require the ambulatory assistance of a cane, that she lacked the insurance coverage necessary to pay for further physical therapy, and that surgical intervention has not been medically indicated "so far." (R.214.)

Also as part of the state agency's consideration of the plaintiff's claim, an in-house medical consultant was asked to assess the plaintiff's functional abilities. Based solely on his review of the then available medical records, he concluded on July 5, 2005 that the plaintiff retained the functional ability to perform a full range of light work activity. [8] (R.204-210.) In contrast to this conclusion by a non-examining, non-treating consultant that the plaintiff was functionally able to stand and walk at least six hours each day, two days later Dr. Gray completed a range of motion assessment at the state agency's request in which he reported that the plaintiff's medical condition significantly limited her range of both spinal and hip motion, both of which are integral to the ability to do light work on a regular and sustained basis. (R.218; *see also* R.231.) Nevertheless, a second state agency consultant in August of the same year affirmed his colleague's earlier *light work* capacity conclusion without any modification or any comment. (R.210.)

---

[8] Light work activity involves lifting no more than twenty (20) pounds with frequent lifting or carrying objects weighing up to ten (10) pounds, and a job in this exertional category generally also requires a good deal of walking or standing or, when it involves sitting most of the time, some pushing and pulling of arm or leg controls. 20 C.F.R. §§ 404.1567(b), 416.967(b).

9

When she saw her primary care physician at the end of July 2005, the plaintiff continued both to report and clinically to exhibit ongoing radicular pain in the right buttock area. (R.232.) Dr. Gray continued pharmacologic management of this chronic problem without change, and he noted that the plaintiff was scheduled to be seen by Dr. John Jane at the University of Virginia Medical Center for a neurosurgery consultation. (*Id.*) When Dr. Gray next saw the plaintiff the following month, he noted that her headaches "had been better" with the use of Inderal, that her back pain was exacerbated by activity, and that she had to cancel her appointment with Dr. Jane because she had no money to pay for it. (R.233.) Samples of several alternative pain relievers were provided to the plaintiff in an effort to treat the aggravation of her back pain, and she was scheduled for a follow-up appointment in late September. (*Id.*)

Six days later, the plaintiff returned to Dr. Gray's office with a throbbing bitemporal and bifrontal headache, attendant nausea and some photophobia (an abnormal light sensitivity). (R.234.) Demoral, Phenergan and Amitriptyline were prescribed, and she was advised to go home and go to bed until the pain abated. (*Id.*)

Following a multi-day exacerbation of her low back pain, the plaintiff went to the emergency room at AMC in mid-September 11, 2005; it was treated with Dilaudid (a hydrogenated ketone of morphine) and Phenergan, and she was advised to have her prescription for Percocet filled. (R.225.) At the time of her regularly scheduled September 27 appointment with Dr. Gray, the plaintiff reported that her migraine headaches seemed to be under control with medication, but she was

continuing to experience chronic back pain. (R.235.) She was given samples of Skelaxin and Celebrex to treat her back pain and was scheduled to be seen in another month. (*Id.*)

During her subsequent appointments with Dr. Gray, in October and November 2005 and in February 2006, the plaintiff reported that her migraine headaches continued to be generally controlled with medication, although she continued to have some migraine headaches and associated vertigo. (R.236-238.) She also reported significant continuing low back pain and attendant radiculopathy, despite the use of hydrocodone (a semi-synthetic opioid) and Skelaxin (a combination muscle relaxant and muscle pain reliever). (*Id.*)

Several months later, and shortly after the administrative hearing, Dr. Gray completed a written assessment of the plaintiff's functional abilities in a work setting. (R.240-244.) He reported that her low back pain and attendant radiculopathy and her migraine headaches were chronic medical problems which directly impacted her abilities during a normal work day. (*Id.*) Outlining the limiting impact, of her back pain specifically, Dr. Gray noted that in a work setting the plaintiff would require hourly work-breaks, would require only a "moderate" exposure to stress, would be able to stand no longer than fifteen minutes at a time, would be able to stand or walk no more than a total of two hours, would be able to sit no more than a total of approximately four hours, would be able to lift ten pounds occasionally, would be able only rarely to stoop or crouch or climb, would be able only rarely to twist her body, and would likely miss work four days each month on average. (*Id.*)

11

*Inter alia*, at the administrative hearing in July 2006, the plaintiff testified that she injured her back while throwing-out trash as part of her job at a Holiday Inn. (R.254-257.) She denied having any back pain prior to this injury; she stated that she had only a ninth grade education, and she said that she could neither read a newspaper nor fill-out a job application without assistance. (R.256.) She testified that she had lost her job due to excessive absences and that she has no health insurance coverage. (R.260,262.) She stated that pain medication never gives her complete relief from her back pain and attendant radiculopathy, that she was currently experiencing "constant" back pain, and she had "lately" been experiencing more frequent migraine headaches. (R.260-263.)

The plaintiff's husband, Clarence Seekford, also testified. He stated that since his wife injured her back, she had stopped doing the housework, "doesn't have patience any more," and "gets angry real quick" (R.273). He testified that he now has to do all of the household chores and all of the driving, despite working a full time job. (R.272-274.)

In response to questions by the ALJ, Robert Jackson, a vocational witness, testified that the plaintiff's former job was exertionally light and unskilled. (R.275.) Considering her age, education, her inability to read or write "too well," he was asked to identify the "kind of sedentary jobs" which such an individual could perform "with a sit/stand option." [9]   In response, Mr. Jackson stated, "Well, that's kind of difficult." (R.275.) He then explained that "typically those types of jobs," such as an order clerk or a production inspector, "require some reading." (*Id.*)  Additionally, he testified

---

[9] The opportunity to change positions during the performance of work activity is typically described as the "sit/stand option" or "sit/stand limitation." *See Gibson v. Heckler*, 762 F.2d 1516. 1518 (11th Cir., 1985).

12

that an individual either with an inability to maintain concentration on simple unskilled tasks for longer than two or three hours or an individual likely to miss work three or four times a month would be unemployable. (R.277.)

## IV.    Analysis

In her brief, the plaintiff's primary contentions are: (1) that the ALJ erred in finding the plaintiff's migraine headaches not to be "severe" within the meaning of the Social Security Act; and (2) that the ALJ also erred in failing to give the requisite evidentiary weight to the functional capacity assessment of Dr. Gray. These contentions will be addressed in turn.

### A.

As one of the plaintiff's assignments of error, she contends that the ALJ wrongly found that her migraine headaches were not "severe" within the meaning of the Act. Quoting *Brady v. Heckler*, 724 F.2$^d$ d 914, 920 (11th Cir., 1984), the Fourth Circuit held in *Evans v. Heckler*, 734 F.2$^d$ 1012, 1014 (4th Cir., 1984), that "an impairment can be considered as 'not severe' only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." *See also* 20 C.F.R. § 4040.1520(c).

In conformity with the differential standard of review, the ALJ's conclusion that the plaintiff's migraine headache syndrome was not "severe" must be affirmed. The finding is based

13

on the medical record, including *inter alia* the treatment notes of Dr. Gray that relate the plaintiff's migraine headaches, and is, therefore, based on substantial evidence.

Beginning with her office visit at the end of August 2005, Dr. Gray's treatment notes show that the plaintiff's migraine headaches "have been better since she's been on the Inderal." (R.233.) Although she returned to Dr. Gray's office during the following week due to ongoing headaches, at the time of her late September appointment Dr. Gray found them to be adequately controlled and stabilized. (R.234-235.) Likewise, at the time of her appointment one month later, Dr. Gray noted that the plaintiff's "migraines [were] doing quite well if she takes her InnoPran" and that she reported her headache problem "to be doing great." (R. 236.) Similarly, at the time of her February 2006 appointment, Dr. Gray's records show that the plaintiff reported still having some headaches and associated vertigo, but they "[seemed] to get better." (R.238.)

In addition, Dr. Gray's functional assessment did not suggest that the plaintiff's headache problem would significantly impair her ability to work. While it mentions the migraine headache diagnosis, the substance of this assessment is almost entirely focused on the impact of her back condition on her ability to function in a work setting on a regular and sustained basis. It is also of note that Dr. Gray made no mention of the plaintiff's headache condition in his list of symptoms, pain location or intensity, and he similarly did not mention of it in his clinical findings. (R.240-244.)

Although the evidentiary bar defining what is "severe" is low under *Evans v. Heckler*, this factual findings of the Commissioner must be upheld, "if [it is] supported by substantial evidence."

14

*Mastro v. Apfel*, 270 F.3<sup>d</sup> 171, 176 (4th Cir. 2001) (*quoting Craig v. Chater*, 76 F.3<sup>d</sup> 585, 589 (4th Cir. 1996)). As outlined, the record in the case now before the court supports the ALJ's factual finding that the plaintiff's migraine headaches are not "severe," and the court is, therefore, obligated to refrain from substituting its judgment for that of the Commissioner.

## B.

Ignoring for the moment Dr. Gray's identification of multiple exertion-specific limitations, he unequivocally reported that the plaintiff's chronic low back condition and attendant radiculopathy was a medical problem which would necessitate her missing work approximately four days each a month (R.243). This limitation alone, as the vocational testimony showed, would render a person with the plaintiff's vocational profile unemployable. (R.276.) Nevertheless, the ALJ deemed Dr. Grays's opinions to be worthy of only "minimal weight," because (by the ALJ's calculation) the plaintiff "had not been treated by Dr. Gray since approximately August 2005." (R.22.)

In the context of this case, this is a significant factual error. Dr. Gray's assessment was dated July 18, 2006, shortly after the administrative hearing, and in fact he had examined and treated the plaintiff on at least six separate occasions between August 2005 and February 16, 2006. (R.233-238, 244,265.) In short, the ALJ predicated his discount of Dr. Gray's assessment on a significant mistake of fact. Given the cited vocational testimony, this factual error by the ALJ effectively dictated an ultimate finding adverse to the plaintiff. For that reason, a detailed discussion of the weight which should be accorded Dr. Gray's assessment is merited.

While the Commissioner concedes in his brief that the ALJ's lapse of time calculation was significantly in error, he argues that the ALJ's non-reliance was nevertheless appropriate. It is his contention that Dr. Gray's office records neither documented any significant treatment nor supporting function-related entries. In addition, he argues that Dr. Gray's functional assessment may be properly discounted because of its "inconsistency" with his treatment notes and its inconsistency with the opinions of the non-treating, non-examining state agency consultants.

By any reasonable measure, particularly given the plaintiff's lack of any health insurance coverage, the Commissioner's no-significant-treatment argument is also factually incorrect. During the course of the fifteen months preceding Dr. Gray's functional assessment, the plaintiff was seen and treated by him on at least fifteen separate occasions for chromic pain either related to her low back or migraine headaches problems, or both. (R.182-193,233-238.) Moreover, his active medical care during this period included the use of several different prescription pain control regimes which included at different times one or more of the following: Demerol, Percocet, Phenergan, Flexeril, Motrin, Celebrex, Skelaxin, and/or Hydrocodone. (R.182-190,231-238.)

Likewise, the Commissioner's more general contention that Dr. Gray's assessment of the plaintiff's functional limitations is inconsistent with his treatment notes is also not well-founded. First and foremost, it fails to recognize Dr. Grays significant longitudinal treatment record beginning in March 2005 for her migraine headaches (R.190) and one month later for her back injury. (R.189).

16

As the Fourth Circuit Court has often noted, "courts typically accord greater weight to the testimony of a treating physician because the treating physician has necessarily examined the [individual] and has a treating relationship with the [individual]." *E.g., Hines v. Barnhart*, 453 F.3<sup>d</sup>559, 563 (4th Cir., 2006) (*quoting* a *Mastro v. Apfel*, 270 F.3<sup>d</sup> 171, 178) (4th Cir., 2001) (citing 20 C.F.R. § 404.1527). "In other words, an ALJ may choose to give a lesser weight to the testimony of a treating physician only when the record demonstrates persuasive evidence to the contrary." *Miller v. Barnhart*, 2006 U.S. Dist. LEXIS 70417 (W.D.Va., 2006).

It is, therefore, undeniable that a treating physician's opinion is entitled to be given controlling weight if it is supported by clinical evidence or consistent with other substantial evidence. *Craig v. Chater*, 76 F.3<sup>d</sup> 585, 590 (4th Cir., 1996). In the case now before the court, Dr. Gray's records demonstrate both an ongoing treating relationship, as the plaintiff's primary care physician, and a solid longitudinal record showing at least fifteen separate opportunities to observe, evaluate, and treat the plaintiff. Quite appropriately, therefore, Dr. Gray could, and most likely did, base his opinion not only on his notes, but also on his general knowledge of the plaintiff's condition and on his medical expertise. *See e.g., Smith v. Schweiker*, 795 F.2<sup>d</sup> 343, 344-235 (4th Cir., 1986); *Winford v. Chater*, 1995 U.S. Dist. LEXIS 20547, *21-23 (E.D.Va., 1995); *Miller v. Barnhart, supra* at *21. Moreover, neither the presence of limited physical findings in Dr. Grays office notes nor even a generally routine approach to pain management constitutes a substantial basis upon which to discount a treating physician's opinion in the absence of significant contradictory medical findings or the contradictory opinion of another treating physician. *See Brown v. Barnhart*, 40 Fed. Appx. 317, 319 (8th Cir., 2002); *Wasson v. Media Gen., Inc.*, 446 F.Supp.2nd 579, 599 (E.D.Va., 2006) (the

17

Fourth Circuit does not require objective evidence in the form of "an MRI, X-ray or some other tangible or physical demonstration of disability").

Although the professional opinions of physicians "based on physical examinations and related observations … are not the same kind of objective evidence as a CT scan or an MRI, they certainly are objective evidence in the form of medical opinion based on first hand observation." *Id.* at 594 (citation omitted).

In his brief, the Commissioner also contends that Dr. Grays July 2006 functional assessment should be given minimal evidentiary weight because of its "inconsistency" with his office notes and records. As support for this argument he cites the absence treatment notes documenting a loss of motor strength or a sensation abnormality, and he cites the range of motion assessment prepared by Dr. Gray three months after the plaintiff's back injury and more than a year before the administrative hearing.

Once again, this contention ignores Dr. Gray's significant longitudinal examination and treatment record at the time he prepared his functional assessment. Moreover, it ignores totally three critical facts. First, the l5/S1 lumbosacral abnormality cause of the plaintiff's low back pain and attendant radiculopathy was objectively documented by an MRI study in May 2005. (R.219.) Second, it fails to acknowledge the fact that this condition is reasonably likely to cause chronic or acute pain. And third, with this diagnosis the plaintiff is entitled to rely exclusively on her subjective

complaints of pain to establish her disability. *Hines v. Barnhart,* 453 F.3[d] 559, 564-66 (4th Cir., 2006).

Finally, the Commissioner also argues that Dr. Gray's assessment may be properly rejected by the ALJ because it was contradicted by the state agency medical consultant's disability assessment. This state-agency assessment was made one year before the administrative hearing and endorsed by another two months later. (R.210.) Manifestly, that assessment did not take into account either Dr. Gray's significant period of subsequent treatment or his findings which were not then a part of the record. Thus, the state agency consultant's review of an incomplete medical record does not constitute substantial evidence in this case, and any reliance on it is misplaced.

On review, therefore, the ALJ's decision to accord "minimal" evidentiary weight to Dr. Gray's functional assessment is not supported by substantial evidence. In effect, it simply represents a improper substitution of the ALJ's judgment for that of a trained, treating medical professional regarding the severity of the plaintiff's physical impairments.

## V.    Proposed Findings of Fact

As supplemented by the above summary and analysis and on the basis of a careful examination of the full administrative record, the following formal findings, conclusions and recommendations are submitted:

19

1.      The Commissioner's final decision is not supported by substantial evidence;

2.      The decision to assign minimal weight to the treating physician's functional assessment is not supported by substantial evidence;

3.      The Commissioner's final decision failed to gave proper consideration and weight to the functional assessment of Dr. Glen Gray, the plaintiff's treating primary care physician;

4.      The Commissioner's final decision failed to gave proper consideration to the functional limitations related to the plaintiff's low back pain and attendant right lower extremity radiculopathy;

5.      Substantial evidence does not support the determination that, through the decision date, the plaintiff retained the functional ability to engage in a limited range of sedentary work on a regular and sustained basis;

6.      The plaintiff has met her burden of proving disability as of April 4, 2005; and

7.      The final decision of the Commissioner should be reversed and the case remanded solely for the purpose of calculating and paying benefits.

## VI. Recommended Disposition

For the foregoing reasons, it is RECOMMENDED that an order be entered REVERSING the final decision of the Commissioner, GRANTING JUDGMENT to the plaintiff, REMANDING the case to the Commissioner for the sole purpose of calculating and paying benefits, denying the defendant's motion for summary judgment, and DISMISSING this case from the docket of the court.

VII. Notice to the Parties

20

Both sides are reminded that, pursuant to Rule 72(b) of the Federal Rules of Civil Procedure, they are entitled to note objections, if any they may have, to this Report and Recommendation within ten (10) days hereof. **Any adjudication of fact or conclusion of law rendered herein by the undersigned to which an objection is not specifically made within the period prescribed by law may become conclusive upon the parties.** Failure to file specific objections pursuant to 28 U.S.C. § 636(b)(1) as to factual recitals or findings as well as to the conclusions reached by the undersigned may be construed by any reviewing court as a waiver of such objections.

The clerk is directed to transmit the record in this case immediately to the presiding United States district judge and to transmit a copy of this Report and Recommendation to all counsel of record.

DATED: 21st day of July 2008.

/s/   James G. Welsh

United States Magistrate Judge
